## ᴵIDE ET AL. *v.* UNITED STATES.

### APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 37. Argued April 18, 1923.—Decided January 7, 1924.

1. The Act of August 30, 1890, c. 837, 26 Stat. 391, in providing that, in all patents issued under the public land laws for lands west of the 100th meridian, there should be expressly reserved, rights of way "for ditches or canals constructed by the authority of the United States," is to be construed, in the light of the circumstances that prompted it, as including canals and ditches constructed after issuance of patent as well as those constructed before. P. 501.

2. Under a statute of Wyoming (Laws 1905, c. 85) granting rights of way over all lands of the State for ditches "constructed by or under the authority of the United States," and providing that reservations thereof shall be inserted in all state conveyances, patents of school land issued by the State to private parties expressly subject to rights of way "reserved to the United States," are subject to the right of the United States thereafter to construct and operate irrigation ditches for a reclamation project over the lands conveyed by the patents. P. 502.

3. This right may be exercised by straightening, and using as a ditch, a natural ravine, to collect waters appertaining to the federal project which have been used in irrigating its lands and are found percolating where they are not needed, and to conduct them elsewhere for further use upon the project. P. 503.

4. The evidence here shows that the ravine in question carried no natural flow of water susceptible of storage, or use in the irrigation season, and therefore none susceptible of private appropriation under the law of Wyoming, and that the water in controversy resulted from seepage from lands irrigated under the federal irrigation project. P. 503.

5. The right of the United States in water appropriated generally for the lands of a reclamation project is not exhausted by conveyance of the right of user to grantees under the project and use of the water by them in irrigating their parcels, but attaches to the seepage from such irrigation, affording the Government priority in the enjoyment thereof for further irrigation on the project over strangers who seek to appropriate it for their lands. P. 505.

74308°—24——32

6. Evidence *held* to refute the contention that the Government had abandoned its right to the seepage waters in controversy.  P. 506.
7. A water permit issued *ex parte* by the State Engineer of Wyoming is a mere license to appropriate water if available, and in accordance with the law of the State.  P. 507.

277 Fed. 373, affirmed.

APPEAL from a decree of the Circuit Court of Appeals which reversed a decree of the District Court for the defendants (appellants here) in a suit by the United States to enjoin interference with work in connection with an irrigation project.

*Mr. D. A. Haggard* and *Mr. Ray E. Lee,* with whom *Mr. David J. Howell,* Attorney General of the State of Wyoming, and *Mr. M. A. Rattigan* were on the brief, for appellants.

*Mr. Assistant Attorney General Riter,* with whom *Mr. Solicitor General Beck* and *Mr. W. W. Dyar,* Special Assistant to the Attorney General, were on the brief, for the United States.

MR. JUSTICE VAN DEVANTER delivered the opinion of the Court.

This is a suit by the United States to enjoin threatened interference with changes which it is making in a natural ravine, called Bitter Creek, in the course of completing and perfecting an irrigation system known as the Shoshone Project. The changes consist in so straightening, widening and deepening the ravine that it may be utilized as a ditch to collect seepage from project irrigation and to carry the water so collected to other lands for further use in their irrigation. The defendants severally own small tracts of land within the project which are either crossed by or adjacent to the ravine, and some claim to have appropriated water in the ravine for the irrigation of their tracts. All, in their

answers, challenge the plaintiff's right to make the changes,—some on the ground that the work involves a trespass on their tracts, and others on the ground that it involves a destruction of their asserted appropriations. And on these grounds they ask affirmative relief.

After a hearing the District Court entered a decree for the defendants. In the Circuit Court of Appeals that decree was reversed with a direction to enter one for the plaintiff. 277 Fed. 373. The defendants then appealed to this court.

The project is a very large one, and was undertaken in accordance with the National Reclamation Act of June 17, 1902, c. 1093, 32 Stat. 388. It was formally approved in 1904; work on it was begun promptly, and parts of it are now nearing completion. It comprehends the impounding of the waters of the Shoshone River and the use of many tunnels, canals and laterals in carrying and applying them to large bodies of public land, all naturally arid and susceptible of cultivation only when irrigated. The lands are disposed of in small tracts as the work progresses, each disposal carrying with it a perpetual right to water from the project canals. The terms of disposal are such that the cost of construction and maintenance ultimately will be borne by the purchasers. There are also provisions under which other owners of small tracts may acquire rights to be supplied with project water by assuming the payment of a just charge.

The entire project is within the State of Wyoming, where irrigation is practiced and the doctrine of appropriation prevails. Pursuant to a direction in § 8 of the act and in conformity with the laws of the State, permits were sought and obtained from the state officers enabling the plaintiff to proceed with the impounding of the waters of the river,—which concededly were open

to appropriation,—and with their distribution, delivery and use in consummating the purposes of the project.

One branch of the project, known as the Garland Division, was designed to accomplish the reclamation and cultivation of a large body of lands, in the center of which was a school section of 640 acres owned by the State. The present controversy arose in that division. The ravine, called Bitter Creek, and the lands of the defendants are all there. In 1908 the work had progressed to a point where the plaintiff began delivering project water to lands in that division. In 1910 the plaintiff sold a small tract adjoining the school section to one of the defendants, and in 1913 sold a like tract similarly situated to another of the defendants. Both tracts are crossed by the ravine. These sales were made under the act, and each carried a project water right. In 1910 and 1911 the State sold most of the school section in small tracts to some of the defendants. Three or four of these tracts are crossed by the ravine. No water right passed with the sales; nor was any project water right sought or obtained by the purchasers. But they attempted to appropriate, and claim they did appropriate, water found in the ravine for the irrigation of their tracts.

It is made very plain on the record that when the defendants acquired the small tracts—two from the plaintiff and the others from the State—the work in that division was well advanced and still in progress, that water was then being delivered through project canals and laterals, that irrigation under them had begun and was being extended, and that the general situation was such as to put the defendants on inquiry respecting the rights which the plaintiff possessed and might exercise in completing and perfecting the work.

With this understanding of matters about which there can be no controversy, we come to the questions brought

to the attention of the courts below and pressed for decision here. Shortly stated they are, (1) whether the plaintiff has a reserved right of way over the small tracts, under which it may convert the ravine into a ditch to be used for the purposes already indicated; (2) whether, apart from seepage from project irrigation, the ravine carries a natural stream or flow of water susceptible of effective appropriation; (3) whether the plaintiff had a right to recapture and utilize seepage from project irrigation finding its way into the ravine, and (4), if it had, whether that right has been abandoned.

1. The patents for the tracts acquired from the plaintiff expressly reserve to it rights of way " for canals and ditches constructed or to be constructed by its authority," and that reservation is based on a direction in the Act of August 30, 1890, c. 837, 26 Stat. 391, that there be expressed in all patents issued under the public land laws for lands west of the one hundredth meridian a reservation of rights of way " for ditches or canals constructed by the authority of the United States." Because the patents say " constructed or to be constructed " when the statute only says " constructed," it is contended that the reservation is broader than the direction, and is to that extent void. But we think the contention ascribes to the direction a narrower scope than Congress intended it should have. The officers of the land department, as the patents show, regard it as comprehending all canals and ditches constructed under the direct authority of the United States, whether the construction precedes or follows the issue of the patent. That the words of the direction admit of this interpretation is plain, and that it accords with the legislative purpose is demonstrable. When the direction was given the United States had no canals or ditches on the public lands west of the one hundredth meridian, either constructed or in process of construction. As yet it had not become engaged in the reclamation of its arid public lands

in that region.   But it was actively conducting investigations and collecting data with a view to developing and formulating a feasible plan for taking up and prosecuting that work.   At an early stage of the investigations Congress became solicitous lest continued disposal of lands in that region under the land laws might render it difficult and costly to obtain necessary rights of way for canals and ditches when the work was undertaken.   To avoid such embarrassment Congress at first withdrew great bodies of the lands from disposal under the land laws.   Act of October 2, 1888, c. 1069, 25 Stat. 526; 19 Ops. Atty. Gen. 564; 9 L. D. 282; 11 L. D. 296.   That action proved unsatisfactory, and, by the Act of August 30, 1890, Congress repealed the withdrawal, restored the lands to disposal under the land laws, and gave the direction that in all patents there should be a reservation of rights of way, etc. Of course the direction must be interpreted in the light of the circumstances which prompted it, and when this is done the conclusion is unavoidable that the direction is intended to include canals and ditches constructed after patent issues quite as much as those constructed before. All courts in which the question has arisen have taken this view.   *Green* v. *Willhite,* 160 Fed. 755; *United States* v. *Van Horn,* 197 Fed. 611: *Green* v. *Wilhite,* 14 Idaho, 238.

Wyoming has a statute granting rights of way over all lands of the State for ditches " constructed by and under the authority of the United States " and providing that all conveyances by the State shall contain " a reservation for rights of way " of that class.   Laws 1905, c. 85.   The patents issued by the State for the tracts in the school section all contain a clause showing that the title was transferred subject to all rights of way granted under the laws of the State " or reserved to the United States."   A contention is made that the statute and the reservation in the patents are confined to ditches constructed while the State owned the land.   But it is not claimed that the

Supreme Court of the State has so decided, and as we read the statute and reservation they refute the contention.

We conclude that the plaintiff has a lawfully reserved right of way over the tracts of the defendants for such ditches as may be needed to effect the irrigation of the lands which the project is intended to reclaim, and that the defendants were apprised of this right by the patents which passed the tracts to them. In short, they received and hold the title subject to the exercise of that right.

Assuming that there is in the ravine crossing these tracts no natural stream or flow of water susceptible of effective appropriation, the plaintiff undoubtedly has the right to make any needed changes in the ravine and to use it as a ditch in irrigating project lands. The defendants do not question this, but they say that the ditch is to be used for drainage purposes, and that this is not within the reserved right. We need not consider the second branch of the objection, for the first is faulty. The evidence shows that the ditch is intended to collect project waters once used in irrigation, and found seeping or percolating where they are not needed, and to conduct them where they can be used in further irrigation. This plainly is an admissible purpose. The defendants also say that there is no need for making any change in the ravine, because its fall, depth, and other features render it adequate for the purpose. There is some testimony to this effect, but the weight of the evidence is quite the other way.

2. On the question whether there is in the ravine a natural stream or flow of water which could be the subject of an effective appropriation, the courts below differed, the District Court resolving it in the affirmative and the Circuit Court of Appeals in the negative. The evidence bearing on the question is conflicting, but the conflict is not difficult of solution, if regard be had for the varying opportunities of the several witnesses for observing and describing the natural conditions.

There was no irrigation in the vicinity of the ravine prior to 1908. Project irrigation there began that year and was gradually extended. Seepage from it promptly found its way into the ravine and kept pace with the irrigation. In 1910 there had come to be enough seepage to produce a small but appreciable flow during the irrigation season. That was an artificial flow, coming from a source created and controlled by the plaintiff. The defendants came on the scene after that flow began. One of them was the chief witness on their side, and the District Court, as shown by its opinion found in the record, attached much weight to his testimony. The witness never saw the ravine or the adjacent country until 1910, and his testimony reflected the changed rather than the natural conditions. The Circuit Court of Appeals rightly pointed this out, and gave greater weight to the testimony of witnesses whose observation and knowledge went back to a time when the natural conditions had not been disturbed.

We have examined the evidence and shall summarize what we regard it as proving.

The ravine is a wash or gully made by surface drainage through a long course of years. It has a length of several miles and receives the drainage from a large area devoid of trees and brush and without lakes or springs. The annual precipitation, including snow, is less than six inches, and the evaporation is pronounced. The water naturally draining into the ravine comes from melting snow and exceptional rains. That from melting snow causes an intermittent flow for about sixty days beginning late in February, and that from exceptional rains sometimes causes a flow for half a day or a day. At all other times the ravine is naturally dry. The flow from melting snow ceases before the irrigation season begins, and topographical conditions are such that it is not practicable to collect and store the water. The de-

fendants have not attempted to do so. The flow from rain is of such short duration and so uncertain that no practical use can be made of it.

As before stated, soon after the project irrigation began, seepage therefrom caused an artificial flow. At first this flow was slight and confined to the irrigation season, but it gradually increased in volume and duration as the irrigated area was extended.

From this summary it is apparent that for short and irregular periods, mostly outside the irrigation season, the ravine has a natural flow, but that this water is not susceptible of useful appropriation. In Wyoming an appropriation which is not useful is of no effect, for under the law of that State beneficial use is the basis, measure and limit of all appropriation. Comp. Stat. 1910, § 724. It follows that the asserted appropriations from the ravine are of no effect, unless they confer or carry some right in the artificial flow. Evidently this is what they really were intended to do.

3. The seepage producing the artificial flow is part of the water which the plaintiff, in virtue of its appropriation, takes from the Shoshone River and conducts to the project lands in the vicinity of the ravine for use in their irrigation. The defendants insist that when water is once used under the appropriation it cannot be used again,—that the right to use it is exhausted. But we perceive no ground for thinking the appropriation is thus restricted. According to the record it is intended to cover, and does cover, the reclamation and cultivation of all the lands within the project. A second use in accomplishing that object is as much within the scope of the appropriation as a first use is. The state law and the National Reclamation Act both contemplate that the water shall be so conserved that it may be subjected to the largest practicable use. A further contention is that the plaintiff sells the water before it is used, and

therefore has no right in the seepage. But the water is not sold. In disposing of the lands in small parcels, the plaintiff invests each purchaser with a right to have enough water supplied from the project canals to irrigate his land, but it does not give up all control over the water or to do more than pass to the purchaser a right to use the water so far as may be necessary in properly cultivating his land. Beyond this all rights incident to the appropriation are retained by the plaintiff. Its right in the seepage is well illustrated by the following excerpt from the opinion of District Judge Dietrich in *United States* v. *Haga,* 276 Fed. 41, 43:

" One who by the expenditure of money and labor diverts appropriable water from a stream, and thus makes it available for fruitful purposes, is entitled to its exclusive control so long as he is able and willing to apply it to beneficial uses, and such right extends to what is commonly known as wastage from surface run-off and deep percolation, necessarily incident to practical irrigation. Considerations of both public policy and natural justice strongly support such a rule. Nor is it essential to his control that the appropriator maintain continuous actual possession of such water. So long as he does not abandon it or forfeit it by failure to use, he may assert his rights. It is not necessary that he confine it upon his own land or convey it in an artificial conduit. It is requisite, of course, that he be able to identify it; but, subject to that limitation, he may conduct it through natural channels and may even commingle it or suffer it to commingle with other waters. In short, the rights of an appropriator in these respects are not affected by the fact that the water has once been used."

An instructive application of this rule is found in *Mc-Kelvey* v. *North Sterling Irrigation District,* 66 Colo. 11.

4. Measures for collecting and using the seepage could not well be taken in advance of its appearance. When

it began to appear in appreciable quantity the plaintiff's officers took up the formulation of plans for utilizing it. The matter was much considered, for like problems were arising in connection with other projects. The advice of army engineers was sought; plans were recommended and adopted; necessary expenditures were authorized, and the work was then undertaken. That on the ravine was begun in 1914. At no time was there any purpose to abandon the seepage. On the contrary, the plaintiff needed and intended to use all of it for project purposes. This was stated and restated in various official reports, including some by the Director of the Reclamation Service and the Secretary of the Interior, and was well understood by the project officers. In these circumstances it is very plain that the plaintiff's right in the seepage was not abandoned.

As making against this conclusion, the defendants say that the plaintiff in 1910 applied to the State Engineer for a permit authorizing it to divert water from the ravine for the irrigation of particular lands and that the application was returned without approval. But we find no evidence of abandonment in this. If the application shows anything material in this connection, it is that the plaintiff was then intending to divert and use the seepage. The reason given by the State Engineer for returning the application without approval was that the irrigation of the particular lands was " already covered " by the plaintiff's existing permit. Certainly nothing was lost by the application or by the engineer's action thereon.

5. The appropriations from the ravine which are asserted by some of the defendants were made under permits issued by the State Engineer in 1910 and 1915, and this is advanced as a reason for sustaining them. The permits were based on *ex parte* applications and were mere licenses to appropriate in accordance with the law of the State, if the water was available. *Wyoming* v. *Colorado,* 259 U. S. 419, 488. We have seen that under the law of the

State the natural flow could not be appropriated, because the conditions did not admit of its beneficial use, and that the artificial flow was not available, because the plaintiff was entitled and intending to use it. The asserted appropriations therefore derive no support from the permits.

*Decree affirmed.*